## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS LUFKIN DIVISION

_____

LUTRON ELECTRONICS CO., INC., )
)
Plaintiff, )   C. A. No. 9:07-CV-43
)
v. )   JUDGE RON CLARK
)
LEVITON MANUFACTURING CO., INC., )
)
Defendant. )
_____)

## COMPLAINT

Lutron Electronics Co., Inc. ("Lutron") complains of Leviton Manufacturing Co., Inc. ("Leviton"), and alleges, on knowledge as to its own conduct and otherwise on information and belief, as follows:

## PRELIMINARY STATEMENT

1.     This is a case of unlawful competition by systematic copying.  It is a lawsuit to recover damages, and to obtain injunctive and other equitable relief, as a result of defendant's willful misappropriation of Lutron's valuable intellectual property – including defendant's infringement of at least five Lutron patents, three Lutron trademarks, Lutron's trade dress, and two Lutron copyrights.

2.     Lutron and defendant Leviton compete in the sale of electrical and electronic devices, including lighting control devices.  Lutron is the industry pioneer, manufacturing and/or supplying more than 10,000 products to address the lighting control requirements of virtually any residential or commercial project.  Lutron's success is the result of its long history of innovation, beginning with its founder's invention of the world's first solid-state dimmer switch.  This history of

innovation is the result of Lutron's substantial investment of approximately 10% of its revenue in research and development.

3.　　　　Leviton has a different vision.  Rather than committing its resources -- *i.e.*, spending millions of its own dollars -- on independent research and development, Leviton has chosen to emulate Lutron by copying its products and misappropriating its valuable intellectual property assets.

4.　　　　Just two years ago, Leviton admitted infringing two Lutron patents not at issue in this case.  Since then, however, Leviton's misconduct has grown only more brazen, extending now to multiple Lutron patents, trademarks, trade dress and copyrights.  For example, and as detailed below, Leviton is manufacturing and selling several products that collectively infringe no less than five of Lutron's patents.  Leviton has also attempted to give its products the distinctive look and feel of Lutron products, misappropriated Lutron trademarks and trade dress, and unlawfully copied Lutron's copyrighted material.

5.　　　　Leviton is a recidivist infringer and must be stopped.  Leviton should not be allowed to reap the financial benefits in the marketplace that would flow from its continued theft of Lutron's valuable intellectual property.

## PARTIES

6.　　　　Lutron is a Pennsylvania corporation with its principal place of business located at 7200 Suter Road, Coopersburg, Pennsylvania 18036-1299.  Lutron is in the business of, and invests extensively in, designing, developing, manufacturing, and marketing new and innovative lighting control products.  Lutron sells its lighting control devices throughout the world.

7.　　　　Leviton is a Delaware corporation with its principal place of business located at 59-25 Little Neck Parkway, Little Neck, New York 11362.  Leviton is a manufacturer and importer of electrical and electronic devices, including dimmer switches and related lighting control devices.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the patent infringement claims pursuant to the provisions of 28 U.S.C. §§ 1331, 1338, 2201 and 2202.

9.      This Court has subject matter jurisdiction over the trademark infringement, trade dress infringement, false designation of origin and unfair competition claims pursuant to the Lanham Act, 15 U.S.C. § 1121, and pursuant to 28 U.S.C. §§ 1331 and 1338(a) & (b).

10.     This Court has subject matter jurisdiction over the copyright infringement claim pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.     This Court has supplemental jurisdiction over the claim arising under state law pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Leviton because it is present and doing business, and has engaged in the actionable conduct alleged below (including acts of infringement), in this Judicial District.

13.     By way of example, Leviton has committed and continues to commit acts of infringement by selling products that collectively infringe all five Lutron patents at issue and copying Lutron's trademarks, trade dress and copyrighted material in and into this Judicial District, and by placing such products into the stream of commerce with the knowledge and intent that they would be sold in this Judicial District.

14.     Leviton products which infinge Lutron's patents were purchased in this Judicial District.  On February 21, 2007, a Vizia dimmer manufactured by Leviton was purchased at The Home Depot, 6200 Park Blvd., Plano, Collin County, Texas 75093, in this Judicial District.  On the same day, an IlluminEssence dimmer manufactured by Leviton was purchased using the interactive website at www.circuitcity.com from a computer in, and for delivery into, this Judicial District.

15.     Venue is proper in this Judicial District pursuant to the provisions of 28 U.S.C. §§ 1391 and 1400(b).

## BACKGROUND

## I.     LUTRON HAS REVOLUTIONIZED THE LIGHTING INDUSTRY

16.     Established in 1961, Lutron introduced the world's first solid-state electronic lighting control device used to dim electric lamps (a generic name for lights of many varieties). This device, often referred to as a "dimmer switch," replaced bulky rheostats and autotransformers that were inefficient and unattractive.  Lutron remains a leading innovator and manufacturer of dimmer switches and other lighting control devices worldwide.

17.     Lutron manufactures and supplies more than 10,000 products to address the lighting control requirements of virtually any residential or commercial project.  These products adjust the intensity of virtually every kind of lamp, and Lutron remains the only company that provides an integrated solution for controlling both natural daylight (with its motorized shades and blinds) as well as electric lighting (with its patented lighting control devices).

18.     Lutron annually spends approximately 10% of its revenue on, and employs hundreds of engineers dedicated to, research and development directed to solving previously insurmountable obstacles and designing ergonomic lighting control devices.  Lutron spends still more on developing markets for its new technology and products, some of which are discussed below.

## A.     Switch and Dimmer Combination - The '930 Patent

19.     Dimmer switches generally feature two distinct functions – a switching (or on/off) function and a dimming function.  For many users, the switching function is used more frequently than the dimming function.  For example, the light level may be set to a low level for a party setting, or the light level may be set just below full intensity for energy saving purposes.

Typically, a user will then use the switching function to turn the lamps on or off to that preset level.

20.      An ideal dimmer switch is one that incorporates both functions (switching and dimming), taking into account the relative frequency with which each is used, and presents the user with a system that is intuitive and simple to operate.

21.      Historically, combining the switching and dimming functions in a single device suffered from two problems:  (a) not allowing the switching function to be performed without disturbing the dimming function and (b) failing to convey to the user the particular function of each part of the product.  Thus, there was a long-felt and unsupplied need in a highly competitive field for a unitary dimmer-switch combination in which the lamp intensity setting established through the use of the dimming function would remain undisturbed when the lamps were turned on or off, even when operated by a user previously unfamiliar with the control.

22.      In the latter half of the 1980s, Lutron engineers set about to solve this problem. Lutron's invention was a product arrangement that provided for, among other things, the switching control to be sized and arranged relative to the dimming control so that the switching function is emphasized over the dimming function from the perspective of the user.

23.      Lutron's invention culminated in U.S. Patent No. 5,637,930 (the "'930 patent"), entitled "Wall-Mountable Switch & Dimmer," attached as Exhibit 1.

24.      Michael J. Rowen, Joel S. Spira, Michael J. D'Aleo, Darryl W. Tucker, Russell J. Jacobs and James R. Graybill are the named inventors on the '930 patent.

25.      The '930 patent issued on June 10, 1997 and will expire on June 10, 2014.  The '930 patent has at all relevant times been owned by Lutron and is presently owned by Lutron as the sole and exclusive assignee and owner of all right, title and interest to the patent.

26.     Since its early Vareo® line of dimmer switches incorporating this technology, Lutron has continued to incorporate the invention of the '930 patent into its other products, including its highly-successful Maestro®, Spacer®, and Diva® product lines.

**B.     Dimmers With Varying Fade Rates - The '919 Patent**

27.     By the early 1990's, some dimmer switches were being controlled by microprocessor-based circuits.  Sophisticated versions of these dimmer switches included circuitry to store previously-set light levels, and some could even implement a fade function, referring to the manner in which the lamp transitions from one light level to another.

28.     While these types of dimmer switches had the potential for greater functionality, they also demonstrated the potential to be confusing for the user.  For example, one tap of a button might cause the lamp to begin fading but then, if the button were tapped again because the user did not realize the fade had begun, the lamp might suddenly jump to full on.

29.     There was therefore a need to harness the power of a digital dimmer switch and to develop a user-friendly dimmer switch with sophisticated fade capability.

30.     Lutron's solution was a dimmer switch with dual-fade-rate capability.  This capability is particularly useful, for example, in situations where it is desirable to allow a longer period of time from the tap of an on-off button to the lamp turning fully off.

31.     Such a dual-fade-rate dimmer switch can allow time for a user to walk from the dimmer switch to a bed before the bedroom goes dark, or for a cleaning staff to collect their equipment and exit through a door some distance from the dimmer switch.  It can also provide the user a clear indication that the fade sequence has been activated, *e.g.,* by fading rapidly at first; or it can provide the user with a helpful warning that the lamp is about to turn off completely, *e.g.,* by altering the fade rate noticeably near the end of the fade sequence.

32.     Lutron's dual-fade rate solution is the subject of U.S. Patent No. 5,248,919 (the

'919 Patent') entitled 'Lighting Control Device,' attached as Exhibit 2.

33.     Robert S. Hanna, Donald F. Hausman, Jr., David E. Houggy, Jr., Donald R.

Mosebrook and Joel S. Spira are the named inventors on the '919 patent.

34.     The '919 patent issued on September 28, 1993 and will expire on March 31, 2012.

The '919 patent has at all relevant times been owned by Lutron and is presently owned by Lutron as

the sole and exclusive assignee and owner of all right, title and interest to the patent.

## C.     Retrofit Two-Way Wireless Lighting Control Systems

### (1)     The '103 Patent

35.     Beginning no later than the 1970's, lighting control and home automation

companies sought a solution that would make whole-home lighting control systems workable.

The goal was to be able to disperse switches and dimmer switches throughout the home or office

space, while at the same time allowing them to be part of a unified system that would allow for

remote control and other benefits.

36.     With such a system, there would be no more wandering the house and garage or

the office complex to check that all lamps were off; the homeowner, cleaning staff or security

would be able to turn all lamps in a building or on a particular floor to full on or off with a single

switch; and lighting would be truly automated.  Two-way communication between switches or

dimmer switches and various remote control units would make this possible as it would allow (1)

remote control and (2) full status reporting for all lighting controls throughout the building.

37.     It was one thing to design such a system for new homes.  If home builders

considered installation of the lighting control system before the walls went up, they could run

communication wires between all the switches, dimmer switches and remote control units in a

relatively straightforward fashion – perhaps requiring a bundle of wires, but at least without having to destroy sections of walls already in place.

38.    The problem was that the vast majority of the market was not new-home construction and would require retrofit applications, whether in existing office buildings and homes or in new construction in which the lighting control system was to be installed after the walls were finished.

39.    Until Lutron invented its new wireless radio-frequency (RF) dimmer switch in the mid-1990's, countless others had focused their efforts to develop a retrofit solution on power-line carrier (PLC) communication and/or systems that could communicate in only one direction, *i.e.*, from the remote control to the switch or dimmer switch.  The one-way communication systems lacked the required functionality, including reliable status reporting; and the PLC systems, which were supposed to communicate by way of a communication signal placed on top of the 60 Hz A.C. voltage in a structure's power wires, proved too unreliable.

40.    Wireless communication held the potential to solve the problem, but numerous technical obstacles stood in the way.  Among the most problematic obstacles for wireless two-way RF communication was the unfriendly electromagnetic environment presented by the standard dimmer switch application.

41.    Squeezing two-way RF communication into the extremely tight spaces available in products designed to fit in standard electrical wall boxes, and in such close proximity to electromagnetically "noisy" dimmer circuits, was thought to be impossible as a practical matter, particularly given that most electrical wall boxes are made of metal, which blocks RF signals.

42.    The resulting technical obstacles were substantial.  Lutron's goal when it began this risky research-and-development effort was a reliable dimming system using standard-sized devices capable of two-way communication without the use of communication wires.

43.     Lutron's research-and-development effort ultimately succeeded, but only with the help of a retained Ph.D. RF specialist as well as the inventor of the original solid-state light dimmer switch.

44.     Lutron's engineers overcame doubts and numerous technical obstacles through dozens of engineer-years of effort. The dimmer switch they developed fits in a standard electrical wall box and includes the power circuitry to dim lamps directly.  It receives commands transmitted wirelessly by a remote control and can report back the status of the lamp, also using wireless RF communication.

45.     Lutron began selling its new RF dimmer switch in 1996 under the "RadioRA®" trademark, and that award-winning RadioRA® dimmer is still selling well today.  Lutron now incorporates its patented RF technology in numerous other products as well.

46.     Lutron's two-way wireless system invention is claimed in U.S. Patent 5,982,103 (the "103 patent") entitled "Compact Radio Frequency Transmitting and Receiving Antenna and Control Device Employing Same," attached as Exhibit 3.

47.     Donald R. Mosebrook, Richard C. Compton, and Joel S. Spira are the named inventors on the '103 patent.

48.     The '103 patent issued on November 9, 1999 and expires on February 7, 2016.  The '103 patent has at all relevant times been owned by Lutron and is presently owned by Lutron as the sole and exclusive assignee and owner of all right, title and interest to the patent.

49.     With Lutron's success in opening the market for retrofit RF lighting control systems, some competitors have in the last several years begun to unlawfully incorporate Lutron's patented technology into their products.  Lutron has since been aggressively, and successfully, defending its patent rights.

### (2)    The '442 Patent

50.    Any installed electrical wall box should allow access to at least two wires, one a õhotö lead and the other a lead connected directly to the lamp.  Many existing structures do not provide a third wire that would allow a direct connection to neutral at the electrical wall box.

51.    This is not a problem for an old-fashioned toggle light switch, because its only role is to close a switch to allow the hot lead to connect to the lamp (to turn the lamp on) and to open the switch to eliminate that connection (to turn the lamp off).  Current flows through the lamp when the switch is closed because the lamp itself has a lead connected to neutral.

52.    For a modern dimmer switch with a self-contained power supply required for microprocessor-based circuits, however, lack of direct access to neutral at the electrical wall box is a serious problem because it limits the power available to the dimmer switch.  This problem in fact explains a critical shortcoming for switches and dimmer switches using PLC communication.

53.    For a PLC-based dimmer switch to allow two-way communication, a direct connection to neutral at the wall box was required to access sufficient power to transmit PLC signals.  But this requirement rendered the dimmer switch unsuitable for many retrofit applications.

54.    The advantage of õretrofitö light controls is the ability to install them in both new and existing homes with a minimum amount of disruption.  After all, the need for a retrofittable lighting control system stemmed from the desire to install such a system in a house or building without cutting into walls or making other costly modifications to the structure itself.  Cutting into walls to run neutral wire throughout the structure, just to be able to install dimmer switches, would defeat that purpose.

55.     Lutron's invention in the mid-1990's solved the problem using two-way RF communication and a relatively low-power RF transmitter.  Lutron's revolutionary dimmer switch is able to transmit information about the status of the lamp even when the only connections to power the dimmer switch that are available at the wall box are through the two standard leads, neither of which is neutral.

56.     Lutron's two-way-RF no-neutral dimmer switch is claimed in U.S. Patent No. 5,905,442 (the "'442 patent") entitled "Method and Apparatus for Controlling and Determining the Status of Electrical Devices from Remote Locations," attached as Exhibit 4.

57.     Donald R. Mosebrook, David E. Houggy, Robert G. Palmer, Jr., Joel S. Spira, Donald F. Hausman, Jr., Robin C. Moseley and David G. Luchaco are the named inventors on the '442 patent.

58.     The '442 patent issued on May 18, 1999 and will expire on February 7, 2016. The '442 patent has at all relevant times been owned by Lutron and is presently owned by Lutron as the sole and exclusive assignee and owner of all right, title and interest to the patent.

**D.     The Power Booster - The '599 Patent**

59.     Another problem facing the lighting industry in the early 1980's was the load limitation of conventional dimmer switches.  Many conventional dimmer switches are confined to a load of between 300 and 1000 watts, and therefore can only control a limited number of lamps.

60.     This becomes a problem in larger spaces, such as banquet halls or floors in commercial buildings where numerous lamps are required to illuminate a single large space. Traditionally, this would require several dimmer switches, each powering only a fraction of the lamps required to light the space.  Each dimmer switch would have to be actuated separately.

61.     To overcome this limitation, Lutron engineers developed its Power Booster product which expands the load a conventional dimmer switch can operate to between 2000 and 3000 watts, allowing a single dimmer switch to control many more lamps.

62.     Lutron's Power Booster invention is claimed in U.S. Patent 4,797,599 (the "'599 patent") entitled "Power Control Circuit with Phase Controlled Signal Output," attached as Exhibit 5.

63.     Jonathan H. Ference, Steven M. Blonstein, Michael J. Rowen, Robert C. Newman, Jr., and Joel S. Spira are the named inventors on the '599 patent.

64.     The '599 patent issued on January 10, 1989 and will expire on April 21, 2007. The '599 patent has at all relevant times been owned by Lutron and is presently owned by Lutron as the sole and exclusive assignee and owner of all right, title and interest to the patent.

## II.     LUTRON'S PRODUCTS

65.     Lutron has incorporated these patented technologies into dozens of products.  For purposes of showing how the technology is being used today, Lutron's Maestro® line of dimmers and RadioRA® products are discussed below.

## A.     Maestro® Products

66.     Introduced in 1992, Lutron's Maestro® dimmer switches incorporate some of these technologies.   Lutron's Maestro® dimmer switch is depicted in Figure 1, below.

67.     On the left side of Figure 1 is a Maestro® package that shows a Maestro® dimmer switch with the faceplate attached, which illustrates how the product appears after installation.



**Figure 1: Lutron's Maestro® dimmer switches and associated package**

68.     The large white rectangle in the middle of the device is a control (button) used to turn the lamp on and off; the much thinner and shorter white rectangle on the right side of the device is a control to raise (by pressing the top portion) and lower (by pressing the bottom portion) the light intensity level of the lamp; and the dots arranged vertically on the left side of the device are a column of seven LEDs used to reflect the approximate light intensity level of the lamp.

69.     The large control in the middle of the device can also be used to turn off the lamp using a variety of fade rates or fade profiles.

70.     The Maestro® dimmer switch has been the subject of extensive advertising and promotion in a variety of media, including print and the Internet.  The Maestro® dimmer switch is highly successful and is sold worldwide.

**B.**      **Lutron's RadioRA® Products**

71.      As detailed above, Lutron's RadioRA® system was the culmination of dozens of engineer-years and millions of dollars of research.

72.      Lutron's RadioRA® products, depicted in Figure 2, below, are components of lighting control systems for the whole home that utilize wireless, two-way radio frequency to communicate the status of the lighting being controlled.



**Figure 2.  Lutron's RadioRA® dimmer switches sold with its RadioRA® system**

73.      Launched in 1997, Lutron's RadioRA® dimmer switches were the first commercial lamp dimmer switches capable of two-way, wireless communication with remote control devices.

III.    **LEVITON HAS ADOPTED A BUSINESS PLAN DIRECTED AT COPYING AND MISAPPROPRIATING  LUTRON'S VALUABLE INTELLECTUAL PROPERTY**

74.     For many years Lutron and Leviton have coexisted in the lighting control industry and competed head to head with a variety of products.  Lutron views such competition as beneficial and lawful -- with Lutron pitting its research and development against Leviton's.

75.     It is clear from the scope of Leviton's infringement of Lutron's intellectual property and its recurrent nature, that Leviton has set upon a conscious course in recent years to misappropriate Lutron's intellectual property.

76.     Leviton's wholesale disregard for Lutron's valuable intellectual property is evident from Leviton's past and current acts of infringement and misappropriation of Lutron's patents, trademarks, trade dress, and copyrighted material.

A.      **Leviton's Past Infringement of Lutron's Patents**

77.     Leviton's systematic efforts to copy and misappropriate Lutron's patented technologies started no later than Leviton's sale of Dimension lighting controls, which infringed two Lutron Patents -- U.S. Patent 4,893,062 (the "062 patent") and U.S. Patent 5,949,200 (the "200 patent") -- relating to Lutron's GRAFIK Eye® system.  Lutron's GRAFIK Eye® system is the industry-leading system for controlling multiple lighting zones.

78.     To protect its patented technology from Leviton's willful infringement of the '062 and '200 patents, Lutron filed suit against Leviton on February 18, 2005 in the Eastern District of Pennsylvania: *Lutron Electronics Co. Inc. v. Leviton Manufacturing Co., Inc.*. Eastern District of Pennsylvania, Civil Action No. 05-779.

79.     The litigation was settled pursuant to a License and Settlement Agreement and Release, both dated August 1, 2005.  In the Settlement Agreement, Leviton admitted that its

products infringed Lutron's patents:  "Leviton acknowledges that each of the Accused Products infringes one of more of the claims of each of the Patents-in-Suit."

**B.** **Leviton Has Continued Its Unlawful Course Of Infringing Lutron's Intellectual Property**

**(1)** **Patent Infringement**

80.      Leviton has continued is brazen strategy to copy Lutron's patented technology. Each of the following Leviton products infringes one or more of Lutron's patents.

**(a)** **Leviton's Vizia Product**

81.      Of all of the designs Leviton could have chosen for its Vizia dimmer switch, the design it chose reflects an unmistakable effort to copy Lutron's successful Maestro® line of dimmer switches.  Leviton's Vizia dimmer switch is pictured next to Lutron's Maestro® dimmer switch in Figure 3, below.



**Figure 3:  Lutron's Maestro® dimmer switch (right) and Leviton's Vizia dimmer switch (left)**

82.     As is evident from Figure 3, Leviton's Vizia dimmer switch is strikingly similar to Lutron's Maestro® dimmer switch.  Both dimmer switches have (a) a large white rectangle in the middle of the device which is a control used to turn the lamp on and off; (b) a much thinner and shorter white rectangle on the right side of the device which is a control to raise (by pressing the top portion) and lower (by pressing the bottom portion) the light intensity level of the lamp; and (c) a vertical bar of seven LEDs on the left side of the device to indicate the approximate light intensity level of the lamp.

83.     The large control of both dimmer switches also enables the user to turn off the lamp using a variety of fade rates or fade profiles.

84.     Leviton offered Vizia for sale at least as early as March 30, 2006.

85.     Leviton's Vizia product infringes at least the '030 and '019 patents.

**(b)     Leviton's IlluminEssence Products**

86.     As shown in Figure 4 below, the appearance of the IlluminEssence dimmer switch is also essentially identical to Lutron's Maestro® dimmer switch.



**Figure 4:  Lutron Maestro® dimmer switch (right) and Leviton IlluminEssence dimmer switch (left)**

87.     In the IlluminEssence dimmer switch, pictured above in Figure 4, the large white rectangle in the middle of the device is a control used to turn the lamp on and off; the much thinner and shorter white rectangle on the right side of the device is a control to raise (by pressing the top portion) and lower (by pressing the bottom portion) the light intensity level of the lamp; and the vertical bar on the left side of the device is a column of seven LEDs used to indicate the approximate light intensity level of the lamp.

88.     In addition to the IlluminEssence dimmer switch, the products at issue also include the IlluminEssence switch, pictured in Figure 5, below.



**Figure 5:  Leviton IlluminEssence switch (with faceplate) and associated package**

89.     The IlluminEssence switch has the large on/off control but does not have the dimming control.

90.     Both the IlluminEssence dimmer switch and IlluminEssence switch can be controlled remotely and can report their status through radio communication, *i.e.*, they are able to transmit and receive radio frequency signals wirelessly.

91.     Monster Central began selling the IlluminEssence products manufactured exclusively for it by Leviton in October, 2006.

92.     Leviton's IlluminEssence products infringe at least the ø930, ø103, and ø442 patents.

(c)     <b><u>Leviton's Acenti Dimmer Switch</u></b>

93.     The Acenti dimmer switch, pictured below in Figure 6, also includes on-off and dimming functionality.  The large black rectangle comprises the on-off control, which can be used to turn a lamp off using a variety of fade rates or fade profiles.



**Figure 6:  Leviton Acenti dimmer switch (middle) and packaging (left and right).**

94.     Leviton's Acenti product infringes at least the ø919 patent.

**(d)     Leviton's Power Extender**

95.     As demonstrated in Figure 7, below, Leviton's Power Extender product is almost an exact replica of Lutron's Power Booster product.



**Figure 7.  Lutron's Power Booster (right) and Leviton's Power Extender (left)**

96.     Not content to limit its unlawful copying of Lutron's Power Booster product to the product itself, Leviton has also copied Lutron's packaging of its Power Booster product. Leviton has made the outside (Figure 8, below) as well as the inside (Figure 9, below) of its Power Extender packaging substantially identical to that of Lutron's Power Booster, in a blatant attempt to confuse consumers.



**Figure 8.  Outside of Lutron's Power Booster Packaging (right) and Leviton's Power
Extender Packaging (left)**



**Figure 9.  Inside of Lutron's Power Booster Packaging (right) and Leviton's Power
Extender Packaging (left)**

97.     Leviton's Power Extender infringes at least the '599 patent.

**(2)     Leviton's Misappropriation of Lutron's Trade Dress, Trademarks and
Copyrighted Material**

98.     Leviton's total disregard for Lutron's intellectual property is not limited to copying

Lutron's patented technology, but also involves systematically misappropriating Lutron's valuable

trade dress, trademarks and copyrights.

(a)    <strong><u>Maestro® Trade Dress</u></strong>

99.    Among Lutron's most popular products is the Maestro® dimmer switch, whose trade dress is a recognized symbol of Lutron's goodwill.

100.    The Maestro® trade dress is comprised of the configuration of a press and tap light dimmer with a clean face plate, dimming rocker and LED light level indicators.  On February 28, 2006, the United States Patent and Trademark Office issued Lutron a trademark registration for the Maestro® trade dress (U.S. Registration No. 3,061,804), attached as Exhibit 6.

101.    The Maestro® trade dress is typically sold with (a) a large rectangular control in the middle of the faceplate; (b) a bezel surrounding the large control; (c) a smaller control on the bezel to the right of the large control, centered vertically; (d) seven LED lights on the bezel to the left of the large control, centered vertically; and (e) the Lutron company name in capital letters and located in the bottom left corner of the large control.

102.    By virtue of Lutron's substantial use, sales and promotion of the Maestro® dimmer switch, the Maestro® dimmer switch's trade dress has become well-known and has come to identify and indicate the source of Lutron's product to consumers and the trade.

103.    Lutron has developed for itself, and its Maestro® trade dress, substantial goodwill and an excellent reputation among actual and potential purchasers and users of its products.

104.    Leviton has attempted to benefit from Lutron's goodwill resulting from the success of the Maestro® trade dress by manufacturing a substantially identical product, known as the Vizia dimmer switch.

105.    As is evident from Figure 3, above, the configuration of Leviton's Vizia dimmer switch is substantially identical to Lutron's Maestro® dimmer switch and Maestro® trade dress.

22

(b)      **Lutron's Viseo® Trademark**

106.    Lutron's Viseo® mark has also been subject to Leviton's unlawful use.  On April 22, 2003, the United States Patent and Trademark Office issued Lutron a trademark registration for Viseo® (U.S. Registration No. 2,709,806), attached as Exhibit 7.

107.    In addition, Lutron uses the Viseo® mark in a stylized form that features a crescent.

108.    Lutron's Viseo® product has been the subject of extensive advertising and promotion in a variety of media, including print and the Internet.

109.    Well after Lutron first began using its Viseo® mark, Leviton commenced manufacturing, distributing, marketing and selling a dimmer switch prominently branded with the Vizia mark.  In addition to copying the Viseo® name, Leviton made its Vizia mark look confusingly similar to Lutron's Viseo® mark, even copying the half-moon crescent of Lutron's Viseo® mark into the Leviton Vizia mark.



**Figure 10.  Lutron's Viseo® Mark (right) and Leviton's Vizia Mark (left)**

110.    Furthermore, in or about August, 2005, Leviton applied for a trademark registration for Vizia.  Lutron is currently opposing the registration of Leviton's Vizia mark in the United States Patent and Trademark Office.

(c)      **Lutron's "Don't Forget the Dimmer" Mark**

111.    Lutron established and used a "Don't Forget the Dimmer" mark in connection with the sale of its products at Home Depot at least as early as April, 2005.

112.    Leviton further pursued its plan of misappropriating Lutron's valuable intellectual property when, on April 21, 2006, it filed an "Intent to Use" trademark application with the United

States Patent and Trademark Office for the phrase "Don't Forget the Dimmer" (Serial No. 78/866,757), attached as Exhibit 8.

113.    Subsequently, Leviton began using the "Don't Forget the Dimmer" mark in connection with its promotional materials -- again, copying a mark Lutron has been using for some time.

114.    Lutron has filed with the United States Patent and Trademark Office a notice of opposition to Leviton's application to register "Don't Forget the Dimmer."

**(d)     Leviton's Use of Lutron's Copyrighted Photographs Featuring Lutron's Products**

115.    Lutron spends significant sums of money on advertising and promotional materials designed to sell its patented technologies.

116.    Lutron has designed and taken photographs of its products for use in its advertising materials.

117.    Leviton had access to and actually obtained copies of the photographs as a result of the creation and distribution of an in-store display for a retail customer of both Leviton and Lutron.

118.    In or about July, 2006, Lutron discovered that Leviton was unlawfully using several Lutron promotional photographs in Leviton Canadian brochures and displays.  Some of the brochures and displays even contained photographs of Lutron dimmers which were represented as Leviton's product.

119.    Leviton unlawfully copied Lutron's promotional photographs and/or designed the infringing brochures and displays in the United States before using them in Canada.

120.    The photographs copied and used by Leviton in its brochures and displays are direct copies of or are substantially similar to Lutron's photographs.

121.     On January 9, 2007, Lutron filed two applications to register copyrights of these photographs with the United States Copyright Office.  Lutron's applications were designated as Process Numbers 155807738 and 155807727 (attached as Exhibits 9 and 10) and are awaiting a formal Application Number.

     **(e)**     **Likelihood of Confusion Resulting from Leviton's Unauthorized Use of Lutron's Trademarks and Trade Dress**

122.     Leviton is not now and has never been authorized by Lutron or its affiliates to use Lutron's Maestro® trademark and trade dress, Viseo® trademark and design mark, and "Don't Forget the Dimmer" in connection with its products.

123.     Leviton's infringing products are sold in similar stores and channels of trade as Lutron's products. Both products are in the same general category of lighting control, and are sold to many of the same retailers and consumers.

124.     Leviton's use of marks substantially similar to the Viseo® trademark and design mark, its use of a product configuration identical or confusingly similar to the Maestro® trademark and trade dress, and its misappropriation of the identical advertising slogan "Don't Forget the Dimmer" are likely to cause confusion, mistake or deception of purchasers and the consuming public as to the source or origin of Leviton's goods and services.

125.     Actual and potential purchasers and consumers, upon encountering Leviton's marks that are substantially similar to the Viseo® trademark and design mark, a product configuration identical or confusingly similar to the Maestro® trademark and trade dress, and an identical "Don't Forget the Dimmer" advertising slogan, are likely to mistakenly believe that Leviton's goods originate with, or are licensed, approved, or sponsored by, or otherwise affiliated with, or related to, Lutron.

126.    Leviton's acts are causing and will continue to cause damage and irreparable harm to Lutron and to its valuable reputation and goodwill with purchasers and consumers.

**FIRST CLAIM FOR RELIEF:  INFRINGEMENT OF THE '930 PATENT**

127.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

128.    Leviton has infringed the '930 patent by making, using, offering for sale, selling, and/or importing and/or participating in the making, using, offering for sale, selling, and/or importing one or more of the infringing devices in violation of 35 U.S.C. § 271(a), or alternatively has contributorily infringed and actively induced infringement of the '930 patent by actively inducing others to use, offer for sale, or sell one or more of the infringing devices of the '930 patent in violation of 35 U.S.C. § 271(b).

129.    Leviton's acts of infringement of the '930 patent have been and continue to be deliberate and willful and in reckless disregard for Lutron's patent rights.

130.    Lutron has been damaged by Leviton's direct and indirect infringement of the '930 patent.

131.    As a result of Leviton's direct and indirect infringement of the '930 patent, Lutron has suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law.  Such irreparable injury shall continue until Leviton's actions are enjoined by this Court.

**SECOND CLAIM FOR RELIEF:  INFRINGEMENT OF THE '919 PATENT**

132.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

133.    Leviton has infringed the '919 patent by making, using, offering for sale, selling, and/or importing and/or participating in the making, using, offering for sale, selling, and/or importing one or more of the infringing devices in violation of 35 U.S.C. § 271(a), or alternatively has contributorily infringed and actively induced infringement of the '919 patent by

actively inducing others to use, offer for sale, or sell one or more of the infringing devices of the '919 patent in violation of 35 U.S.C. § 271(b).

134.    Leviton's acts of infringement of the '919 patent have been and continue to be deliberate and willful and in reckless disregard for Lutron's patent rights.

135.    Lutron has been damaged by Leviton's direct and indirect infringement of the '919 patent.

136.    As a result of Leviton's infringement and inducement of infringement of the '919 patent, Lutron has suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law.  Such irreparable injury shall continue until Leviton's actions are enjoined by this Court.

## THIRD CLAIM FOR RELIEF:  INFRINGEMENT OF THE '103 PATENT

137.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

138.    Leviton has infringed the '103 patent by making, using, offering for sale, selling, and/or importing and/or participating in the making, using, offering for sale, selling, and/or importing one or more of the infringing devices in violation of 35 U.S.C. § 271(a), or alternatively has contributorily infringed and actively induced infringement of the '103 patent by actively inducing others to use, offer for sale, or sell one or more of the infringing devices of the '103 patent in violation of 35 U.S.C. § 271(b).

139.    Leviton's acts of infringement of the '103 patent have been and continue to be deliberate and willful and in reckless disregard for Lutron's patent rights.

140.    Lutron has been damaged by Leviton's direct and indirect infringement of the '103 patent.

141.    As a result of Leviton's infringement and inducement of infringement of the '103 patent, Lutron has suffered and will continue to suffer irreparable injury for which there is no

adequate remedy at law.  Such irreparable injury shall continue until Leviton's actions are enjoined by this Court.

### FOURTH CLAIM FOR RELIEF:  INFRINGEMENT OF THE '442 PATENT

142.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

143.    Leviton has infringed the '442 patent by making, using, offering for sale, selling, and/or importing and/or participating in the making, using, offering for sale, selling, and/or importing one or more of the infringing devices in violation of 35 U.S.C. § 271(a), or alternatively has contributorily infringed and actively induced infringement of the '442 patent by actively inducing others to use, offer for sale, or sell one or more of the infringing devices of the '442 patent in violation of 35 U.S.C. § 271(b).

144.    Leviton's acts of infringement of the '442 patent have been and continue to be deliberate and willful and in reckless disregard for Lutron's patent rights.

145.    Lutron has been damaged by Leviton's direct and indirect infringement of the '442 patent.

146.    As a result of Leviton's infringement and inducement of infringement of the '442 patent, Lutron has suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law.  Such irreparable injury shall continue until Leviton's actions are enjoined by this Court.

### FIFTH CLAIM FOR RELIEF:  INFRINGEMENT OF THE '599 PATENT

147.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

148.    Leviton has infringed the '599 patent by making, using, offering for sale, selling, and/or importing and/or participating in the making, using, offering for sale, selling, and/or importing one or more of the infringing devices in violation of 35 U.S.C. § 271(a), or alternatively has contributorily infringed and actively induced infringement of the '599 patent by

actively inducing others to use, offer for sale, or sell one or more of the infringing devices of the '599 patent in violation of 35 U.S.C. § 271(b).

149.    Leviton's acts of infringement of the '599 patent have been and continue to be deliberate and willful and in reckless disregard for Lutron's patent rights.

150.    Lutron has been damaged by Leviton's direct and indirect infringement of the '599 patent.

151.    As a result of Leviton's infringement and inducement of infringement of the '599 patent, Lutron has suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law.  Such irreparable injury shall continue until Leviton's actions are enjoined by this Court.

## SIXTH CLAIM FOR RELIEF:  INFRINGEMENT OF
## FEDERALLY REGISTERED MARK (15 U.S.C. § 1114(1)(a))

152.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

153.    This claim is for the infringement of a trademark registered in the United States Patent and Trademark Office, pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)(a).

154.    By its unauthorized duplication of the trade dress of Lutron's Maestro® dimmer in the Leviton Vizia dimmer, Leviton has infringed Lutron's federally registered Maestro® trade dress in violation of 15 U.S.C. § 1114(1)(a).

155.    The trade dress of Leviton's Vizia dimmer is confusingly similar to, and a colorable imitation of, Lutron's federally registered Maestro® trade dress and is likely to cause confusion and mistake and to deceive the public as to the approval, sponsorship, license, source or origin of Leviton's products.

156.    Leviton's acts of trademark infringement have been done willfully and deliberately and Leviton has profited and been unjustly enriched by sales that it would not otherwise have made but for its unlawful conduct.

157.    Leviton's willful and deliberate acts described above have caused injury and damages to Lutron, have caused irreparable injury to Lutron's goodwill and reputation, and, unless enjoined, will cause further irreparable injury, for which Lutron has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF:  TRADE DRESS INFRINGEMENT, FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION  (15 U.S.C. § 1125(a))

158.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

159.    This claim is for trade dress infringement, false designation of origin, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

160.    By its unauthorized duplication of the product configuration and trade dress of Lutron's Maestro® dimmer in the Leviton Vizia dimmer, Leviton has engaged in trade dress infringement, false designation of origin, and unfair competition in violation of 15 U.S.C. § 1125(a).

161.    The trade dress and product configuration of Leviton's Vizia dimmer is confusingly similar to, and a colorable imitation of, Lutron's product configuration of the Maestro® dimmer and is likely to cause confusion and mistake and to deceive the public as to the approval, sponsorship, license, source or origin of Leviton's products.

162.    Leviton's acts of trade dress infringement, false designation of origin, and unfair competition have been done willfully and deliberately and Leviton has profited and been unjustly enriched by sales that it would not otherwise have made but for its unlawful conduct.

163.    Leviton's acts described above have caused injury and damages to Lutron, have caused irreparable injury to Lutron's goodwill and reputation, and, unless enjoined, will cause further irreparable injury, for which Lutron has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF:  INFRINGEMENT OF
## FEDERALLY REGISTERED MARK (15 U.S.C. § 1114(1)(a))

164.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

165.    This claim is for the infringement of a trademark registered in the United States Patent and Trademark Office, pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)(a).

166.    The Vizia mark used by Leviton is confusingly similar to, and a colorable imitation of, the federally registered Viseo® mark, and infringes Lutron's trademark rights. Leviton's use of the Vizia mark is likely to cause confusion and mistake and to deceive the public as to the approval, sponsorship, license, source or origin of Leviton's products.

167.    Leviton's acts of trademark infringement have been done willfully and deliberately and Leviton has profited and been unjustly enriched by sales that it would not otherwise have made but for its unlawful conduct.

168.    Leviton's willful and deliberate acts described above have caused injury and damages to Lutron, and have caused irreparable injury to Lutron's goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby Lutron has no adequate remedy at law.

## NINTH CLAIM FOR RELIEF:  INFRINGEMENT OF
## UNREGISTERED MARKS (15 U.S.C. § 1125(a))

169.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

170.    This claim is for the infringement of a trademark used in commerce by Lutron.

171.     Leviton's use of the "Don't Forget the Dimmer" mark is confusingly similar to, and in fact identical to, Lutron's mark.  Leviton's use of the "Don't Forget the Dimmer" mark is likely to cause confusion and mistake and to deceive the public as to the approval, sponsorship, license, source or origin of Leviton's products.  Leviton's infringement of Lutron's unregistered mark is in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

172.     Leviton's use of the Viseo® crescent design is confusingly similar to, and a colorable imitation of, Lutron's design covering that mark.  Leviton's use of the Viseo® crescent design is likely to cause confusion and mistake and to deceive the public as to the approval, sponsorship, license, source or origin of Leviton's products.

173.     Leviton's acts of trademark infringement have been done willfully and deliberately and Leviton has profited and been unjustly enriched by sales that it would not otherwise have made but for its unlawful conduct.

174.     Leviton's willful and deliberate acts described above have caused injury and damages to Lutron, and have caused irreparable injury to Lutron's goodwill and reputation, and, unless enjoined, will cause further irreparable injury, for which Lutron has no adequate remedy at law.

## TENTH CLAIM FOR RELIEF:  COPYRIGHT INFRINGEMENT (17 U.S.C. §§ 101 *et seq.*)

175.     Lutron incorporates all foregoing paragraphs as if fully set forth herein.

176.     This claim is for copyright infringement in violation of The Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*

177.     By its unauthorized copying of promotional photographs and preparation of derivative works, Leviton has infringed Lutron's copyright in and relating to the photographs.

178.    Lutron is entitled to a permanent injunction restraining Leviton, its directors, officers, agents, servants and employees, and all persons acting in concert or privity with it, from engaging in any further such acts in violation of the copyright laws.

179.    Lutron is further entitled to recover from Leviton the damages it has sustained and will sustain, and any gains, profits and advantages obtained by Leviton as a result of Leviton's acts of infringement alleged herein.  At present, the amount of such damages, gains, profits and advantages cannot fully be ascertained by Lutron.

### ELEVENTH CLAIM FOR RELIEF:  VIOLATION OF TEXAS COMMON LAW OF UNFAIR COMPETITION

180.    Lutron incorporates all foregoing paragraphs as if fully set forth herein.

181.    Leviton's misconduct described above constitutes unfair competition under Texas common law.  Its misconduct was knowingly and intentionally executed and constitutes an unlawful, unfair, and fraudulent business practice.

182.    Leviton's use of marks substantially similar to the Viseo® trademark and design mark, its use of a product configuration identical or confusingly similar to the Maestro® trade dress, its misappropriation of the identical advertising mark "Don't Forget the Dimmer," and its use of Lutron's proprietary photographs featuring Lutron products, was knowingly and intentionally executed, and each individually, and all collectively, reflect a pattern and practice that constitutes an unlawful, unfair and fraudulent business practice in violation of the Texas common law tort of unfair competition.

183.    Leviton's conduct has created, and will continue to create, a likelihood of confusion between Lutron's products and Leviton's products.

184.    Lutron is entitled to a permanent injunction restraining Leviton, its directors, officers, agents, servants and employees, and all persons acting in concert or privity with it, from engaging in any further such acts of unfair competition in violation of Texas common law.

185.    Lutron is further entitled to recover from Leviton the damages it has sustained and will sustain, and any gains, profits and advantages obtained by Leviton as a result of Leviton's acts of unfair competition alleged herein.  At present, the amount of such damages, gains, profits and advantages cannot fully be ascertained by Lutron.

## JURY DEMAND

186.    Lutron hereby requests a jury trial as to all issues in this action that are so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Lutron requests that this Court:

(a)     Preliminarily and permanently enjoin Leviton, and those in active concert or participation with Leviton from further infringement of the:  (1) '930, '919, '103, '442, and '599 patents; (2) Maestro® trademark and trade dress; (3) Viseo® trademark and design mark; (4) "Don't Forget the Dimmer" mark; and (5) Lutron copyrighted photographs;

(b)     Require Leviton to issue corrective advertising and/or notices and to destroy all existing stock of any products infringing upon the:  (1) '930, '919, '103, '442, and '599 patents; (2) Maestro® trademark and trade dress; (3) Viseo® trademark and design mark; (4) "Don't Forget the Dimmer" mark; and (5) Lutron copyrighted photographs;

(c)     Award Lutron damages adequate to compensate Lutron for Leviton's infringement of the:  (1) '930, '919, '103, '442 and '599 patents; (2) Maestro® trademark and trade dress; (3) Viseo® trademark and design mark;

(4) "Don't Forget the Dimmer" mark; and (5) Lutron copyrighted photographs, including statutory damages pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, and together with interest and costs as provided by 35 U.S.C. § 284;

(d)     Award Lutron damages, including punitive damages, to compensate Lutron for Leviton's unfair competition, including Leviton's violation of Texas common law unfair competition;

(e)     Find that Leviton's infringement of the '930, '919, '103, '442 and '599 patents has been willful and deliberate and award Lutron treble damages as provided by 35 U.S.C. § 284;

(f)     Award Lutron any post judgment interest as provided by 28 U.S.C. § 1961;

(g)     Declare that this is an exceptional case and award Lutron its reasonable attorneys' fees as provided by 35 U.S.C. § 285 and 15 U.S.C. § 1117;

(h)     Award all costs incurred by Lutron in this action; and

(i)     Grant any such other and further relief as this Court deems just and proper.

Dated:  March 2, 2007                    Respectfully submitted,


                                         ___/s/ J. Thad Heartfield_____
                                         George Chandler
                                           Texas Bar No. 04094000
                                         **CHANDLER LAW OFFICES**
                                         207 E. Frank, Suite 105
                                         P.O. Box 340
                                         Lufkin, Texas 75902-0340
                                         Tel. (936) 632-7778
                                         Fax  (936) 632-1304
                                         gchandler@chandlerlawoffices.com

                                         J. Thad Heartfield
                                           Texas Bar No. 09346800
                                         **THE HEARTFIELD LAW FIRM**
                                         2195 Dowlen Road
                                         Beaumont, Texas 77706
                                         Tel. (409) 866-3318
                                         Fax  (409) 866-5780
                                         thad@jth-law.com

                                         Clyde M. Siebman
                                           Texas Bar No. 18341600
                                         **SIEBMAN, REYNOLDS, BURG**
                                         **  & PHILLIPS, LLP**
                                         Federal Courthouse Square
                                         300 N. Travis Street
                                         Sherman, Texas  75090
                                         Tel. (903) 870-0070
                                         Fax  (903) 870-0066
                                         clydesiebman@siebman.com

Bill Sims
  Texas Bar No. 18429500
Scott W. Breedlove
  Texas Bar No. 00790361
John D. Taurman
  Texas Bar No. 19680400
David E. Killough
  Texas Bar No. 24030903
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel. (214) 220-7700
Fax  (214) 220-7716
bsims@velaw.com
sbreedlove@velaw.com
jtaurman@velaw.com
dkillough@velaw.com

*Attorneys For Lutron Electronic Co., Inc.*

OF COUNSEL:

James D. Herschlein *(pro hac vice pending)*
David S. Benyacar *(pro hac vice pending)*
Daniel Boglioli *(pro hac vice pending)*
Danielle Garrod *(pro hac vice pending)*
**KAYE SCHOLER LLP**
425 Park Avenue
New York, New York 10022-3598
Tel. (212) 836-8000
Fax  (212) 836-8689
jherschlein@kayescholer.com
dbenyacar@kayescholer.com
dboglioli@kayescholer.com
dgarrod@kayescholer.com